**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**EMCASCO Insurance Company,**

                    PLAINTIFF,

VS.

**WOODWARD-PARKER   CORPORATION**
**OF BLOOMFIELD,**

              DEFENDANT.

C.A. No.

HON.

---

**MICHAEL T. RYAN P53634**
**Merry, Farnen & Ryan, P.C.**
ATTORNEYS FOR PLAINTIFF
300 Maple Park Blvd., Suite 301
St. Clair Shores, Michigan 48081
586-776-6700 / 586-776-5927 (direct)
586-776-1501 – FAX
mryan@mfr-law.com

---

<u>**COMPLAINT FOR DECLARATORY JUGMENT**</u>

    Plaintiff, **EMCASCO Insurance Company (EMC),** states as follows in its Complaint for Declaratory Judgment:

<u>**PARTIES AND JURISDICTION**</u>

    1.    EMC brings this complaint for declaratory judgment under 28 USC §2201-2202 and Federal Rule of Civil Procedure 57, which authorize the court to declare the rights and legal relations of interested parties seeking such a declaration.  EMC requests a declaration that first-party property insurance coverage under the businessowners insurance policy it issued to Woodward-Parker Corporation of Bloomfield (WPC) is inapplicable to a claim arising out of a water loss that occurred at WPC's office building on February 5, 2021.

2.     EMC is a foreign corporation with its principal place of business in Des Moines, Iowa and it conducts business in Oakland County, Michigan.

3.     WPC is a Michigan corporation with its principal place of business at 44060 Woodward Avenue, Ste. 200, Bloomfield Hills, Michigan, 48302-5040, and it conducts business in Oakland County, Michigan.

4.     Because EMC is an Iowa corporation and WPC is a Michigan corporation, complete diversity of jurisdiction between the parties exists.

5.     WPC submitted a sworn proof of loss in connection with its insurance claim setting forth a preliminary estimate of the alleged water damage to its building in the amount of $361,447.

6.     Because complete diversity of jurisdiction exists between the parties and the amount in controversy exceeds the sum of $75,000 exclusive of interest and costs, this court has subject matter jurisdiction to hear this case under 28 USC §1332(a).

## FACTS

7.     EMC repeats the allegations above as if set forth in full.

### A.     The Water Loss and Resulting Clam.

8.     WPC owns an office building located at 44060 Woodward Avenue, Bloomfield Hills, Michigan, 48302-5040.

9.     In February of 2021, EMC insured WPC's building under a businessowners policy bearing policy number 4W6-50-55-21.  See **Exhibit A**.  This was a renewal policy that took effect on November 21, 2020, and the policy period associated with this policy is 11/21/20

to 11/21/21.  The policy periods associated with the two prior policies were 11/21/18 to 11/21/19 and 11/21/19 to 11/21/20.  See **Exhibit A.**

10.     On February 5, 2021, a plumbing line that was part of the fire suppression sprinkler system in the upper level of WPC's building froze and then ruptured, discharging water that allegedly damaged the building and business personal property contained therein.

11.     WPC therefore submitted a claim to EMC for first-party property insurance coverage under Section I of policy number 4W6-50-55-21.

12.     EMC assigned claim number Z01642438 to WPC's claim and then commenced the adjusting of the loss.

### B.     EMC's Efforts to Obtain Information and Documentation.

13.     On February 9, 2021, the EMC property adjuster assigned to the claim, Andrew Baranski, sent WPC a letter requesting repair invoices pertaining to this loss, quotes for the costs associated with repairing the water damage, lease agreements pertaining to tenants who were occupying the property on the date of loss, and a list of personal property items WPC would be claiming in this claim.  See **Exhibit B – 2/9/21 Baranski letter**.

14.     On February 10, 2021, Baranski sent WPC an email setting forth a list of information and documentation EMC required to adjust the claim, including information concerning the tenants inside the building on the date of loss and current lease information, and a timeline of events beginning with who was typically at the building, how often, whether there were any tenants currently in the building, and who discovered the water loss and when. **Exhibit C – 2/10/21 Baranski email.**

15.     EMC requested this information because there is a vacancy condition in the policy which says that, if a building where a loss occurs has been vacant for more than 60 consecutive

COMPLAINT FOR DECLARATORY JUDGMENT
PAGE 3 OF 25

days before the loss, EMC will not pay for loss or damage caused by sprinkler leakage unless the insured has protected the system against freezing.  The vacancy provision also says EMC will not pay for loss caused by water damage where the property has been vacant for more than 60 days before the loss.  See **Exhibit A, ¶** E. Property Loss Conditions, 8.b.(1)(b)-(d), pages 28-29 policy.

16.     The vacancy condition also sets forth a detailed definition of the terms building and vacant.  See **Exhibit A, ¶** E. Property Loss Conditions, 8.a.(1)(a)-(b)(i)-(ii), page 28 of policy.

17.     In requesting information and documentation concerning the presence of tenants in the insured property, EMC was doing nothing more than conducting an otherwise ordinary yet crucial investigation for a first-party insurance claim of this sort involving a commercial office building.

18.     Given the presence of the vacancy condition in WPC's policy, EMC could not make any coverage determinations without first ascertaining whether, during 60 days before the loss, the insured property was vacant within the meaning of the condition.

19.     On February 18, 2021, Baranski sent WPC another correspondence again requesting information and documentation concerning this claim. **Exhibit D – 2/18/21 Baranski correspondence.**

20.     By this point, EMC felt it prudent to continue its adjustment of this claim under a reservation of rights letter, and it therefore sent WPC the February 18, 2021, reservation letter attached as **Exhibit E**.

21.     On page 9 of the reservation letter, EMC notified WPC that, based on the information it presently had, it appeared as though the insured property may have been vacant within the meaning of the vacancy policy condition contained in the EMC policy.

22.     EMC also directed WPC to the Property Loss Conditions in the policy which set forth an insured's duties in the event of loss or damage. See page 6 of **Exhibit E**.

23.     EMC expressed its concern that WPC had failed to take all reasonable steps to protect the property from further damage following the water-loss incident.  See page 7 of **Exhibit E.**

24.     Significantly, EMC also specifically requested WPC's cooperation in its investigation and settlement of the claim pursuant to paragraph 3.a.(8) of the Property Loss Conditions.  See last paragraph at the bottom of page 7 of **Exhibit E.**

25.     At the very end of the reservation letter, EMC again requested documentation. Among the things EMC requested were lease agreements WPC had with tenants for the three years prior to the loss, records concerning the maintenance of heat and/or repairs to the furnace, monthly utility bills for the insured premises, and all records concerning repair, renovation and mitigation efforts undertaken by WPC after the loss. See pages 10-11 of **Exhibit E.**

26.     Despite EMC's multiple requests and its reservation letter in which it in good faith notified WPC of is concerns over the potential applicability of the vacancy condition (among other things), as of March 1, 2021, WPC had not yet provided any of the documentation EMC requested.

27.     Therefore, on March 1, 2021, Baranski sent WPC an email again requesting documentation.  See **Exhibit F – 3/1/21 Baranski email**.

28.     On March 3, 2021, EMC sent WPC still another letter reiterating the multiple document requests that it had made and again requesting the documentation pursuant to the conditions applicable to the property coverages under the policy.  See **Exhibit G – 3/3/21 letter.**

29.     EMC emphasized that it "… wishes to do nothing more than obtain all the requested information and documentation concerning this claim as soon as possible so that it can complete its evaluation of coverage for this claim and/or its adjusting of this loss."  See page 4 of **Exhibit G**.

30.     As of March 10, 2021, now over a month after the date of loss, WPC still had not provided any of the requested documentation.

31.     EMC therefore sent WPC another letter notifying WPC that its failure to cooperate with EMC's efforts in the investigation and adjusting of this claim was causing severe prejudice to EMC's ability to complete its consideration of the claim. See **Exhibit H – 3/10/21 letter,** page 1.

32.     It also notified WPC that its failure to cooperate with EMC constitutes a breach of the policy conditions cited in the reservation of rights letter.  See **Exhibit H**, page 1.

33.     EMC remarked further in its March 10 letter "… **EMC does not wish to deny coverage for this claim due to lack of cooperation so please, at your earliest convenience, simply provide [EMC] with the documentation that EMC has requested so that the Company can continue its investigation and adjusting of this claim.**" See **Exhibit H**, pages 1-2, emphasis in original.

34.     It bears noting now that, up to this point in time, EMC sent all the letters and emails referenced above to H. Wallace Parker, the owner and sole shareholder of WPC.  Parker is also a licensed attorney in Michigan.

C.      **WPC Finally Responds.**

35.     WPC finally responded to EMC's multiple document requests with a March 25, 2021, email from Parker to Baranski in which Parker remarked "Considering the fact that EMC insurance has, with out cause, refused to comply with the terms of the Insurance contract, I am and have continued to deal with issues of my building."

36.     WPC did not, however, provide any of the requested information or documentation along with its March 25 email.

37.     EMC responded to WPC's March 25 email with a March 30, 2021, letter rejecting the notion that EMC is the one that has refused to comply with the terms of the insurance policy. See **Exhibit I – 3/30/21 letter.**

38.     EMC again respectfully asked WPC to comply with the policy conditions and provide it with the information and documentation it has been requesting since the outset of its efforts to adjust this claim. See **Exhibit I – 3/30/21 letter.**

39.     Approximately two months after the date of loss, on April 9, 2021, WPC finally responded to EMC's multiple document requests.  It provided a sworn proof of loss which provided a preliminary damage estimate of $361,447.

40.     It also provided six different lease agreements purportedly signed by tenants who WPC claimed were occupying the insured property on the date of the loss.  See **Exhibit J – 4/9/21 correspondence from WPC with attachments**.

41.     H. Wallace Parker signed each of these lease agreements and his signatures on each were notarized by a Notary Public named Amanda Jill Wahl.

42.     While there are purported signatures on each lease by lessees and witnesses, the signatures are not notarized and most of them are completely illegible.

43.     WPC also supplied two affidavits, one signed by attorney David McGruder and a second signed by Amanda Wahl.

44.     In her affidavit, Wahl describes the events that transpired on the date of loss and the actions she took, which include calling the Bloomfield Township Police and Fire Departments, and the fire suppression sprinkler contractor.

45.     She also describes water pooling in the basement of the insured property, and she speaks of her subsequent meeting with the fire suppression sprinkler contractor, who allegedly told her that only one sprinkler line had ruptured.

46.     Wahl is also the one that emailed the April 9 letter and attachments to Baranski, and in her transmittal email she identifies herself as the "business manager" for Woodward-Parker Corporation. See **Exhibit J.**

47.     Based upon the content of her affidavit and the presence of her notary stamp on the six leases referenced earlier, Wahl was an eyewitness to the events that occurred on and after the date of loss, and she also has direct information concerning the validity and authenticity of the documentation WPC submitted in support of its claim.

### D.     The Examinations Under Oath.

48.     After reviewing the documentation WPC submitted on April 9, EMC decided to exercise its rights to conduct examinations under oath pursuant to the Property Loss Conditions of policy number 4W6-50-55-21.

49.     On April 15, 2021, EMC requested the examinations under oath of H. Wallace Parker and Amanda Wahl. See **Exhibit K – 4/15/21 letter.**

50.     EMC also renewed its request for the considerable number of documents that were still outstanding based on prior requests.  See pages 3-4 of **Exhibit K**.

51.     WPC refused to permit Wahl to sit for an examination under oath.

52.     WPC's refusal to permit Wahl to sit for an exam is unjustified and inexplicable considering that it submitted an affidavit bearing her signature in support of its request for coverage for this claim.

53.     Wahl has relevant information concerning this claim and the documentation WPC submitted in support of it.

54.     WPC's refusal to allow her to sit for an exam under these circumstances is part of a broader pattern of delay, obfuscation, and lack of cooperation that it has exhibited from the earliest stages of EMC's efforts to investigate and adjust this loss, and it constitutes a frank violation of the conditions in the EMC policy.

55.     WPC's refusal to permit Wahl to sit for an examination under oath also greatly prejudices EMC's ability to investigate and adjust this loss, given the role she played in the story of this claim as outlined above.

56.     On May 13, 2021, through counsel WPC provided additional documentation concerning this claim including estimates that had been previously provided as well as mold remediation reports.  See **Exhibit L – 5/13/21 letter from attorney David McGruder.**

57.     WPC failed to provide utility bills or other records showing that it maintained the heat in the premises.

58.     It also failed to provide any other documentation to verify that the tenants identified on the leases were occupying the insured property in the 60 days prior to the loss.

> **i.      H. Wallace Parker's EUO – first session.**

59.     The first session of Parker's examination under oath occurred on July 9, 2021, approximately five months after the date of loss.  **Exhibit M – 7/9/21 EUO transcript.**

60.     Despite the multiple document requests EMC made for documentation concerning the issues outlined above and discussed in EMC's reservation letter, WPC provided little, if any, of the requested material prior to the July 9 exam.

61.     Parker did not present any new documentation to his July 9 exam.

62.     Although Parker's first examination under oath session was suspended due to technical difficulties, he did testify that during the year 2019 he was not in the state of Michigan at all. See **Exhibit M,** page 21, lines 10-14.

> ii.     <u>**Documentation EMC intends to question Parker upon at second EUO session.**</u>

63.     EMC had planned to question Parker during the July 9 exam concerning multiple pieces of documentation.

64.     For example, during its investigation EMC discovered that the Woodward-Parker Corporation of Bloomfield had been dissolved on July 15, 2019. **Exhibit N – LARA documentation pertaining to dissolution of Woodward-Parker Corporation of Bloomfield.**

65.     EMC also discovered that, on December 5, 2019, WPC sold the insured property on a land contract to Trillion, LLC for $4.2 million.  See **Exhibit O – Land Contract.**

66.     EMC compared the December 5, 2019, land contract to the leases WPC submitted in support of this claim and discovered that four of the six leases were allegedly signed in December of 2019, the same month as the land contract sale, with one of the leases allegedly being signed the day *after* the parties executed the land contract:

- 12/6/19 Platinum Group, LLC lease -  **Exhibit P**

- 12/13/19 F&D Business Consulting, LLC lease – **Exhibit Q**

- 12/19/19 Parker-McGruder & Associates lease – **Exhibit R**

- 12/20/19 Trinity House lease – **Exhibit S**

67.     WPC allegedly executed the fifth lease with Huoban, LLC on July 3, 2019. **Exhibit T – Huoban Lease.**

68.     As noted above, while each of the 2019 leases bear Parker's signature and Wahl's notary stamp indicating that he signed them before her in Michigan, Parker's initial EUO testimony that he was not in the State of Michigan at all in calendar year 2019 raised serious concerns over the validity and authenticity of these lease agreements.

69.     The sixth lease is dated December 1, 2012, and is between the Woodward-Parker Corporation and Competitive Education Solutions, Inc. See **Exhibit U**.

70.     This lease also bears H. Wallace Parker's signature and Amanda Jill Wahl notarized the signature as having occurred before her on December 1, 2012.

71.     The notary stamp Amanda Jill Wahl used to notarize this signature, however, indicates that her commission expires on May 16, 2024. See page 6 of **Exhibit U.**

72.     MCLA 55.269 says that a Notary Public may reside in, move to, and perform notarial acts anywhere in the state of Michigan from the date of appointment until the notary's birthday occurring not less than six years and not more than seven years after the date of his or her appointment.

73.     A notary commission that expires on May 16, 2024, would not yet have been issued as of December 1, 2012.

74.     The notary commission that would have been in existence on December 1, 2012, when H. Wallace Parker allegedly signed the Competitive Education Solutions, Inc. lease would have been issued to Amanda Jill Wahl on May 16, 2012 and would have expired on May 16, 2018.

75.     Prior to Parker's second examination under oath session on August 2, 2021, EMC also discovered that two of the lessees with whom WPC allegedly executed leases had also been dissolved.   See **Exhibit V – LARA documentation concerning dissolution of Parker McGruder & Associates and LARA documentation concerning dissolution of Competitive Education Solutions.**

76.     Based on all this information, the facts appeared to indicate that the Woodward-Parker Corporation of Bloomfield was no longer in existence, therefore meaning that it lacked the capacity to contract not only with EMC but also with the six tenants that were allegedly occupying the property on the date of loss.

77.     EMC had serious concerns whether the leases WPC submitted in connection with the claim were authentic and it appeared as though the vacancy condition was applicable.

78.     Therefore, going into Parker's second examination under oath session, EMC hoped to obtain information from him concerning, fundamentally, whether WPC was still an on-going corporation, whether WPC filed taxes, whether WPC had tenants in the property, and whether those tenants paid the security deposits and monthly rent reflected on the leases.

79.     EMC wished to obtain information concerning precisely who Amanda Jill Wahl is what her role with WPC is.

80.     EMC also hoped to discover whether she maintained and could provide the statutorily required records of all notarial acts she executed within the last five years (see MCLA 55.313) which would speak directly to the authenticity of the leases in question.

      **iii.**        **H. Wallace Parker's EUO – second session.**

81.     During his second examination under oath session, Parker refused to provide any meaningful information concerning WPC's history of filing state and federal income taxes. See

pages 13-20 of **Exhibit W – 8/2/21 EUO transcript of H. Wallace Parker's second examination under oath.**

82.     Parker refused to provide information concerning WPC's accountant and financial records even after being told the reason EMC was asking those questions:

Q     I'm glad this is on the record, too. As I was saying, sir, I am trying to figure out whether the Woodward Parker Corporation of Bloomfield is a going concern. That's in part why I'm asking you about tax records. Hold on. That's also in part why I'm asking you about the accountant. Let me ask you this question. Can you tell me when the last time the Woodward Parker Corporation of Bloomfield had financial statements, annual financial statements prepared on its behalf reflecting its operations?

See **Exhibit W,** page 24, lines 12-22

Q     Relative to – let me just go back to my question. I was trying to figure out whether or not the Woodward Parker Corporation of Bloomfield is an on-going concern. That's why I am asking you about financial statements. I am going to ask you about what the business of Woodward Parker Corporation of Bloomfield, what the actual business activities are here in a couple of minutes. But before I get to that, I just want to know, if the corporation has been preparing tax returns and preparing financial statements in light of what the state of Michigan shows specifically that the corporation was dissolved in 2019 and there hasn't been any filing since 2016. That's a fair question. That's all I want to know.

See **Exhibit W,** page 25, lines 8-23.

Q     My question is, as of the date of loss, did the Woodward Parker Corporation of Bloomfield have a bank account that it used for operational purposes with the business?

A     No place in the insurance policy did I have with your company that should say that its incumbent upon me having a bank account, or whether or not companies that I have have bank accounts.

See **Exhibit W,** page 27, lines 8-14.

83.     Parker also refused to answer questions concerning what Amanda Wahl's relation was, if any, to the Woodward-Parker Corporation of Bloomfield.  **Exhibit W,** pages 31-32.

84.     EMC asked Parker whether the tenants WPC allegedly had in the premises paid security deposits and rent payments.

85.     EMC asked this question to determine not only if WPC was an on-going concern but also to determine whether there were rent-paying tenants in the premises in the 60 days prior to the loss.

86.     Given the concerns over the authenticity of the leases, evidence that WPC deposited security deposits and rent payments into a bank account would be extremely helpful when attempting to determine whether the leases are authentic and if the insured property was occupied or vacant.

87.     Inexplicably, Parker refused to answer these questions as well. See pages 35-41 of **Exhibit W.**

88.     Parker also refused to answer questions concerning whether tenants were required to pay utility bills. See **Exhibit W,** page 45.

89.     EMC then asked for any other documentation that WPC might have which would establish that in the 12 months before the date of loss, the premises was occupied by tenants, again explaining the reason for the request:

> Q     Hold on. **Sir, understand, if there is documentation out there that indicates, that verifies that the insured on this policy had tenants in the property in the year right up to the date of loss, that's relevant and that will help you establish that the premises was occupied. So my question is, do you have any such documentation that you can provide to me and the insurance company**?

See **Exhibit W,** pages 48-49, lines 19-25, line 1 (emphasis added).

90.     Parker responded to this line of questioning by referring to the pandemic (p. 48, lines 2-14), but, to date, WPC still has not provided any documentation to establish that the insured property was occupied as of the date of loss.

91.     Parker refused to answer questions concerning the land contract sale and its close proximity to WPC's alleged leasing of the premises to multiple tenants (**Exhibit W,** pages 57-62), and he also refused to provide contact information for the tenants and witnesses that allegedly signed these leases, which, had he provided it, would have enabled EMC to contact those individuals to see if they had signed the leases in question, had paid the security deposits, had paid rent, and/or had occupied or planned to occupy the premises at some point in time.  See **Exhibit W,** pages 85-93.

92.     When asked for an explanation concerning the December 1, 2012, Competitive Education Solutions lease and the May 16, 2024, notary stamp, his testimony is unclear and arguably evasive. See **Exhibit W**, pages 120-124.

93.     Parker refused on multiple occasions to answer the direct question whether the six leases he submitted to support WPC's claim were created after the loss to make it appear as though the premises was occupied, at one point even going so far as to call counsel a "jackass" for allegedly accusing him of violating the law.  See **Exhibit W**, page 88, lines 24-25.

94.     EMC also questioned Parker about the steps WPC has taken to mitigate the water loss and protect the property from further harm. Parker admitted that other than pumping out the water that had accumulated in the basement of the insured premises and turning the heat back on, WPC has done nothing to take any additional steps to extract the water from the premises, dry the premises out, and/or perform repair work. See **Exhibit W –** pages 153-156.

95.     After Parker's second examination under oath session was complete, EMC sent WPC's counsel an August 4, 2021, email in follow-up to the examination requesting additional documentation that came up during the examine and renewing its requests for the outstanding documentation. **Exhibit X – 8/4/21 email.**

96.     On August 24, 2021, EMC sent WPC's counsel the two examinations under oath transcripts asking H. Wallace Parker to read and sign them, and then return them along with any errata sheets. EMC also renewed its request for the documentation in question. **Exhibit Y – 8/24/21 email.**

97.     As of the date of this filing, WPC still has not responded fully to EMC's multiple document requests.

## REQUEST FOR DECLARATORY JUDGMENT

98.     EMC repeats the allegations above as if set forth in full.

99.     Based on the information EMC has obtained to this point, the Woodward-Parker Corporation of Bloomfield was dissolved on July 15, 2019, and therefore lacked the capacity to contract.

100.    Had EMC known that WPC had been dissolved as of July 15, 2019, and was no longer in existence, it would have cancelled the 11/21/18 to 11/21/19 policy as of that date and it would have refused to issue the renewal policies covering terms 11/21/19 to 11/21/20 and 11/21/20 to 11/21/21.

101.    The reason for this is that, as a dissolved non-existent corporation that lacked the capacity to contract, WPC was ineligible for coverage under EMC's underwriting guidelines.

102.    EMC therefore requests a declaration rescinding policy number 4W6-50-55-21 retroactive to the date of WPC's dissolution, July 15, 2019.  Prior to service of this complaint upon WPC, EMC shall file a motion to establish trust account with the court into which it shall tender and/or deposit the insurance premiums covering this time pending the outcome of this declaratory judgment action.

103.    In the alternative, EMC requests declaratory relief based on the following policy terms, conditions, and exclusions.

104.    Policy number 4W6-50-55-21 contains the following vacancy condition:

**a.      Description Of Terms**

(1) As used in this Vacancy Condition, the term building and vacant have the meanings set forth in Paragraphs (a) and (b) below:

(a) When this policy is issued to a tenant, and with respect to that tenant's interest in Covered Property, building means the unit or suite rented or leased to the tenant.  Such building is vacant when it does not contain enough business personal property to conduct customary operations.

(b) When this policy is issued to the owner or general lessee of a building, building means the entire building.  Such building is vacant unless at least 31% of its total square footage is:

(i)      Rented to a lessee or sublessee and used by the lessee or sublessee to conduct is customary operations and/or

(ii)     Used by the building owner to conduct customary operations.

(2) Buildings under construction or renovation are not considered vacant.

**b.      Vacancy Provisions**

If the building where loss or damage occurs has been vacant for more than 60 consecutive days before that loss or damage occurs:

**(1)** We will not pay for any loss or damage caused by any of the following even if they are Covered Causes of Loss:

**(a)** Vandalism;

**(b)** Sprinkler leakage, unless you have protected the system against freezing;

**(c)** Building glass breakage;

**(d)** Water damage;

**(e)** Theft; or

**(f)** Attempted theft.

**(2)** With respect to Covered Causes of Loss other than those listed in Paragraphs (1((a) through (1)(f) above, we will reduce the amount we would otherwise pay for the loss or damage by 15%.

See pages 28-29 of **Exhibit A.**

105.    Based on the information EMC presently has, the insured property located at 44060 Woodward Avenue, Bloomfield Hills, Michigan was vacant within the meaning of the vacancy conditions set forth above. EMC therefore requests a declaration that coverage does not apply to this loss pursuant to the vacancy provision.

106.    Policy number 4W6-50-55-21 also contains the following "Fungi" Wet Rot Or Dry Rot exclusion which is prefaced by an anti-concurrent causation clause:

**B.    Exclusions**

    **1.**    We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss. These exclusions apply whether or not the loss event results in widespread damage or affects a substantial area.

        **i.    "Fungi", Wet Rot or Dry Rot**

        Presence, growth, proliferation, spread or any activity of "fungi", wet rot or dry rot.
        But if "fungi", wet rot or dry rot results in a "specified cause of loss", we will pay for the loss or damage caused by that "specified cause of loss".

        This exclusion does not apply:
        **(1)** When "fungi", wet rot or dry rot results from fire or lightning; or
        **(2)** To the extent that coverage is provided in the Limited Coverage For "Fungi", Wet Rot Or Dry Rot Additional Coverage, with respect to loss or damage by a cause of loss other than fire or lightning.

See pages 17 and 20 of **Exhibit A.**

107.    The policy defines "fungi" as follows:

    **4.**    "Fungi" means any type or form of fungus, including mold or mildew, and any mycotoxins, spores, scents or by-products produced or released by fungi.

See page 33 of **Exhibit A**.

108.    EMC requests a declaration that pursuant to the "Fungi" Wet Rot Or Dry Rot exclusion applies to exclude all coverage for any fungi, wet rot or dry rot that may be present at the premises.

109.    The exclusions say further:

**2.**    We will not pay for loss or damage caused by or resulting from any of the following:

      **b.**    **Consequential Losses**

            Delay, loss of use or loss of market.

      **e.**    **Frozen Plumbing**

            Water, other liquids, powder or molten material that leaks or flows from plumbing, heating, air conditioning or other equipment (except fire protective systems) caused by or resulting from freezing, unless:

            **(1)** You do your best to maintain heat in the building or structure; or
            **(2)** You drain the equipment and shut off the supply if the heat is not maintained.

      **k.**    **Neglect**

            Neglect of an insured to use all reasonable means to save and preserve property from further damage at and after the time of loss.

      **l.**    **Other Types Of Loss**

            **(1)** Wear and tear;
            **(2)** Rust or other corrosion, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself;

                        . . .

            **(4)** Settling, cracking, shrinking or expansion;

See pages 20-22 of **Exhibit A**.

110.     EMC requests a declaration that there is no coverage for any consequential losses pursuant to exclusion 2.b. above.

111.     Based on the information and documentation presently in the claim record, WPC did not do its best to maintain the heat in the building or structure or drain the equipment and shut off the supply if the heat is not maintained thereby triggering exclusion 2.e. for frozen plumbing.

112.     Based on Parker's examination under oath testimony, WPC has neglected to use all reasonable means to save and preserve the property from further damage at and after the time of loss thereby triggering the neglect exclusion set forth in exclusion 2.k.

113.     Exclusion 2.l. applies to exclude all coverage for wear and tear, decay, deterioration, settling, cracking, shrinking or expansion that occurs at the premises.

114.     EMC requests a declaration pursuant to each of these exclusions that coverage is inapplicable for this claim.

115.     The exclusions say further:

**3.**     We will not pay for loss or damage caused by or resulting from any of the following Paragraphs **a.** through **c.**  But if an excluded cause of loss that is listed in Paragraphs **a.** through **c.** results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

    **a.  Weather Conditions**
       Weather conditions. But this exclusion only applies if weather conditions contribute in any way with a cause or event excluded in Paragraph **B.1.** above to produce the loss or damage.

                        . . .

    **c.  Negligent Work**
       Faulty, inadequate or defective:
      **(4)** Maintenance;
         Of any part or all of any property on or off the described premises.

See page 22 of **Exhibit A**.

116.    EMC requests a declaration that the weather conditions exclusion applies to the extent weather conditions contributed to the development of "fungi" wet rot or dry rot at the premises.

117.    EMC also requests a declaration that the faulty, inadequate, or defective repair and maintenance exclusion set forth in paragraphs 3.c(2)-(4) apply to exclude all coverage for this claim.

118.    EMC also requests a declaration pursuant to the policy conditions that coverage does not apply to this claim.

119.    The Property Loss Conditions say:

**E.      Property Loss Conditions**

**3.   Duties In The Event Of Loss Or Damage**

a.   You must see that the following are done in the event of loss or damage to Covered Property:
         . . .

(4) Take all reasonable steps to protect the Covered Property from further damage, and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim. This will not increase the Limits of Insurance of Section I – Property. However, we will not pay for any subsequent loss or damage resulting from a cause of loss that is not a Covered Cause of Loss. Also, if feasible, set the damaged property aside and in the best possible order for examination.

(5) At our request, give us complete inventories of the damaged and undamaged property. Include quantities, costs, values and amount of loss claimed.

(6) As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records.
Also permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies from your books and records.
         . . .

(8) Cooperate with us in the investigation or settlement of the claim

**(9)** Resume all or part of your "operations" as quickly as possible.

    **b.** We may examine any insured under oath, while not in the presence of any other insured and at such times as may be reasonably required, about any matter relating to this insurance or the claim, including an insured's books and records. In the event of an examination, an insured's answers must be signed.

  **4. Legal Action Against Us**
No one may bring a legal action against us under this insurance unless:
    **a.** There has been full compliance with all of the terms of this insurance; and
    **b.** The action is brought within two years after the date on which the direct physical loss or damage occurred.

See pages 24-25 of **Exhibit A.**

120.    Based on the discussion of the facts set forth above as well as the supporting documentation, WPC stands in frank violation of these policy conditions.

121.    WPC has admittedly failed to take all reasonable steps to protect the insured property from further damage after the initial loss occurred in violation of paragraph 3.a.(4).

122.    Despite multiple requests, WPC has not yet provided complete inventories of the damaged and undamaged property, including quantities, costs, values, and the amount claimed in violation of paragraph 3.a.(5).

123.    WPC has blatantly refused to provide documentation to EMC and/or to allow EMC to examine its books and records in violation of condition 3.a.(6).

124.    WPC has refused to cooperate with EMC in violation of condition 3.a.(8) and although H. Wallace Parker sat for an examination under oath, his refusal to answer multiple questions even after being told why those questions were being asked and how they related to the insurance coverage issues in this claim violates the spirit and intent of the examination under oath condition set forth in condition 3.b. above and itself constitutes a breach of contract.

125.     Policy number 4W6-50-55-21 also contains the following condition concerning concealment, misrepresentation, or fraud:

**SECTION III – COMMON POLICY CONDITIONS (APPLICABLE TO SECTION I – PROPERTY AND SECTION II – LIABILITY)**

**B.      Concealment, Misrepresentation Or Fraud**

This policy is void in any case of fraud by you as it relates to this policy at any time. It is also void if you or any other insured, at any time, intentionally conceals or misrepresents a material fact concerning:

**1.** This policy;
**2.** The Covered Property;
**3.** Your interest in the Covered Property; or
**4.** A claim under this policy.

See **Exhibit A** - SECTION III – COMMON POLICY CONDITIONS (APPLICABLE TO SECTION I – PROPERTY AND SECTION II – LIABILITY), paragraph C. Concealment, Misrepresentation Or Fraud, pages 51 and 52 of policy.

126.     Based on the information presently in the claim record, the only reasonable conclusion is that WPC violated this policy condition by submitting the six leases referenced throughout this complaint in support of its request for insurance coverage for this claim.

127.     Four of these leases appear to bear false or fraudulent notary stamps by a Michigan notary attesting that Parker signed them during calendar year 2019 when, by his own admission during his examination under oath, he was not in the State of Michigan at all during the year 2019.

128.     One of the leases WPC submitted in support of its claim, the Competitive Education Solutions lease, contains a signature that was notarized by a notary whose commission, according to the notary stamp on the lease, is set to expire on May 16, 2024.

129.     The commission under which the notary notarized Parker's signature on this lease had not yet been issued as of December 1, 2012, the date he allegedly signed the document.

130.     Despite EMC's efforts during Parker's second examination under oath, WPC has failed to provide any reasonable explanation for the circumstances surrounding these leases.

131.     It has refused to provide contact information for the lessees and witnesses who allegedly signed the leases so that EMC can attempt to verify the authenticity of the documents, and it has failed to provide any additional, independent documentation (such as banking records showing receipt of rents and security deposits) to support its claim that the leases are authentic.

132.     The only reasonable conclusion therefore is that these leases, and the Competitive Education Solutions lease in particular, are false and/or fraudulent documents which WPC submitted to EMC in attempt to mislead EMC concerning the occupancy status of the insured property in the 60 days prior to the date of loss.

133.     WPC's submission of these leases to EMC in support of its claim violates the concealment, misrepresentation or fraud condition set forth above.

134.     WPC's violation of and failure to comply with the Property Loss Conditions and the Concealment, Misrepresentation or Fraud conditions has caused extreme prejudice to EMC's rights under the policy including but not limited to its right and ability to conduct a full and complete investigation of this claim.

135.     EMC therefore also requests a declaration that all coverage is inapplicable to this claim due to WPC's violation of and failure to comply with the policy conditions.

## **RELIEF REQUESTED**

For the reasons outlined above, EMC requests the following declaratory and equitable relief:

A.     The court's declaratory judgment that policy number 4W6-50-55-21 is rescinded due to underwriting ineligibility.

B.   The court's declaratory judgment in the alternative that EMC has no duty under policy number 4W6-50-55-21 to provide insurance coverage of any sort under Section I of the policy for claim number Z01642438.

C.   EMC also asks the court to award it any other equitable and/or declaratory relief and damages to which it is entitled in connection with the prosecution of this declaratory judgment action.

DATED:   August 30, 2021

*s/Michael T. Ryan*
**MICHAEL T. RYAN P53634**
**Merry, Farnen & Ryan, P.C.**
ATTORNEY FOR PLAINTIFF
300 Maple Park Blvd., Suite 301
St. Clair Shores, MI 48081
586-776-5927
mryan@mfr-law.com