UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

EMCASCO INSURANCE COMPANY,

Plaintiff,

v.

WOODWARD-PARKER CORPORATION OF
BLOOMFIELD,

Defendant.

_____/

Case No. 21-12014

U.S. DISTRICT COURT JUDGE
GERSHWIN A. DRAIN

## OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [ECF No. 28]

### I.     Introduction

Emcasco Insurance Company ("Plaintiff", "EMC", or "Counter-Defendant") filed a complaint for declaratory judgment on August 30, 2021. See ECF No. 1. The dispute pertains to a businessowners insurance policy that EMC issued to Woodward-Parker Corporation of Bloomfield ("Defendant", "WPC", or "Counter-Plaintiff"). The Policy covered WPC's office building (the "insured property"). Prior to this litigation, WPC filed an insurance claim arising out of water damage that occurred to the insured property on February 5, 2021 (the "loss"). EMC seeks a declaratory judgment indicating that the policy is inapplicable to WPC's loss.

1

The Clerk of Court entered a default as to WPC on November 24, 2021. That default was set aside on May 17, 2022. On the same day, WPC filed a counterclaim alleging that EMC breached the terms of its businessowners insurance policy by failing to pay WPC for physical losses and damages to its real property and business personal property, including its consequential losses and business income losses. ECF No. 15, PageID.609. WPC also asserts that EMC's "dilatory behavior" in handling of WPC's claims caused WPC to suffer additional physical damages to its property and additional business income losses. *Id*.

EMC filed a motion for summary judgment on September 7, 2023. WPC responded on September 28, 2023, and EMC replied on October 9, 2023. The Motion is fully briefed. Upon review of the briefing and applicable authority, the Court concludes that oral argument will not aid in the resolution of this matter. Accordingly, the Court will resolve the EMC's Motion for Summary Judgment [ECF No. 28] on the briefs. See E.D. Mich. L.R. 7.1(f)(2). For the reasons set forth below, EMC's Motion is denied.

## II.    Factual Background

WPC owns the insured property located at 44060 Woodward Avenue, Bloomfield Hills, Michigan, 48302-5040. WPC originally insured this property with EMC on November 21, 2018. That policy was renewed annually until the latest renewal period, which ended on November 21, 2021. As such, the insured property

was insured with EMC under a businessowners Policy bearing policy number 4W6-50-55-21 on the date when the loss occurred.

The loss occurred on February 5, 2021. A plumbing line that was part of the fire suppression sprinkler system in the upper level of WPC's building froze and ruptured, discharging water to the basement, first, and second floors. This water allegedly damaged all of the soft surfaces (ceiling tiles, drywall and carpets) of the building (the "loss"). ECF No. 29, PageID.1293. WPC submitted a claim to EMC for first-party property insurance coverage. *Id*.

EMC assigned a claims adjuster to WPC's insurance claim. On February 18, 2021, EMC sent to WPC a reservation of rights letter (the "ROR"). The ROR stated that, "[d]uring its initial efforts to investigate and adjust th[e] loss, EMC has discovered information which may have bearing on the applicability of insurance for th[e] claim." ECF No. 28-11, PageID.1265. EMC requested certain documentation regarding the insured property and "reserve[d] its rights to exclude or disclaim some or all coverage for th[e] claim." *Id*. Specifically, the ROR raised the following issues: (1) the insured property may have been "vacant within the meaning of the vacancy condition" set forth in the Policy; (2) EMC "ha[d] a concern that [WPC] ha[d] failed to take all reasonable steps to protect the property from further damage" following the "pipe break incident"; (3) "it [was] not clear . . . that the limited coverage available" under the "'Fungi', Wet Rot or Dry Rot Additional Coverage provision"

applied; and (4) EMC requested cooperation from WPC, including the production of certain documents. *Id*. at PageID.1265-1274.

At this time, WPC's sole shareholder was H. Wallace Parker ("Mr. Parker"). Mr. Parker's law firm, Parker, McGruder & Associates, P.C., was a tenant in the building. At the time of WPC's insurance claim, Mr. Parker was allegedly residing in North Carolina for cancer treatment. ECF No. 29, PageID.1294. He passed away on December 9, 2022, and this litigation is now being directed by his daughter and Personal Representative of his Estate, Meriel Parker.

On April 9, 2021, approximately two months after the building was damaged, WPC submitted a Sworn Statement in Proof of Loss (the "POL") to EMC. ECF No. 1-10, PageID.232-236. The POL included an attachment of the Affidavit of David McGruder, Mr. Parker's law partner. In his Affidavit, Mr. McGruder declared that he had been to work in the building on the day prior to the loss from about 1:30 p.m. until around 5:00 p.m. *Id*. at ¶1; PageID.233. He discovered the water loss upon his arrival at work on Friday, February 5, 2021, at about 2:30 p.m. *Id*. at ¶2; PageID.233. Mr. McGruder also stated that "[t]he conditions in the office building were normal until after 5:00 p.m. on the day prior to the water damage" and "[n]o alarms were sounding, it was warm, as if the heat were working and no water was running." *Id*. at ¶8; PageID.233.

There are several factual allegations, EMC argues, which demonstrate that WPC's loss is not covered under the Policy. Notably, EMC alleges that, on April 9, 2021, WPC provided to EMC six lease agreements that were signed by various tenants who purportedly occupied the insured property on the date of the loss, including: (1) Parker McGruder and Associates, P.C.; (2) Competitive Education Solutions ("CES"); (3) Huoban, LLC; (4) F&D Business Consulting, LLC; (5) Trinity House of Prayer; and (6) Platinum Group. Each of the leases bear the signature of Mr. Parker and the notarization of Amanda Wahl, WPC's business manager. EMC alleges that Ms. Wahl's notarization falsely attested that "Parker signed the lease on the date stated while in Oakland County, Michigan[,]" but "Parker did not personally appear before [Ms. Wahl] to sign any of the leases." ECF No. 28, PageID.675-676. Mr. Parker sat for Examinations Under Oath ("EUO") with EMC on July 9, 2021, and August 2, 2021. He was questioned about each of the leases, *inter alia*.

In support of its Motion for Summary Judgment, EMC's Motion raises several issues pertaining to its denial of coverage for WPC's claim. These issues include:

1) the administrative dissolution of WPC during the policy period;

2) alleged misrepresentations EMC made regarding the leases and purported tenants who occupied the building;

3) WPC's alleged transferal of ownership over the building during the policy period;

5

4) WPC's alleged failure to mitigate damages in accordance with the Policy; and

5) mold discovered in the building in April 2021.

The Court will discuss each issue, along with the applicable law, in the corresponding analysis sections below.

### III.   Summary Judgment Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). No genuine dispute of material fact exists where the record "taken as a whole[,] could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus., Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The moving party "bears the initial responsibility of informing the district court of the basis for its motion," and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548.

Ultimately, the court evaluates "whether the evidence presents a sufficient disagreement to require submission to a [factfinder] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 251– 52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). To determine whether a genuine dispute of material fact exists, the Court "draw[s] all reasonable inferences and view[s] the evidence in the light most favorable to the [nonmovant]". *Henschel v. Clare Cty. Rd. Comm'n*, 737 F.3d 1017, 1022 (6th Cir. 2013).

## IV.   Discussion

### (1) Whether EMC is entitled to Rescind the Policy Due to WPC's Administrative Dissolution

#### i. Applicable Law

Federal courts exercising diversity jurisdiction apply the law of the forum state. *Uhl v. Komatsu Forklift Co., Ltd*., 512 F.3d 294, 302 (6th Cir. 2008). There is no dispute that Michigan law governs EMC's Motion. In *Meemic Ins. Co*., the Michigan Supreme Court has recognized "several interrelated but distinct common-law doctrines—loosely aggregated under the rubric of 'fraud'—that may entitle a party to a legal or equitable remedy if a contract is obtained as a result of fraud or misrepresentation." *Meemic Ins. Co. v. Fortson*, 506 Mich. 287, 304–05, 954 N.W.2d 115, 124 (2020). It noted that a "defrauded party could only seek rescission, or avoidance of the transaction, if the fraud related to the inducement or inception of the contract." *Id*. "Rescission abrogates a contract and restores the parties to the relative positions that they would have occupied if the contract had never been made." *Bazzi v. Sentinel Ins. Co*., 502 Mich. 390, 409; 919 N.W.2d 20 (2018).

Even when a party is induced into a contract by fraudulent representations, however, recission "is not strictly a matter of right." *Id*. (quoting *Amster v. Stratton*, 259 Mich. 683, 686, 244 N.W. 201 (1932)). A claim to rescind a transaction is equitable in nature and is therefore subject to "the sound discretion of the court." *Id*.; See *Lenawee Co Bd of Health v. Messerly*, 417 Mich. 17, 31, 331 N.W.2d 203 (1982) (stating that rescission is "an equitable remedy which is granted only in the sound discretion of the court"). When a plaintiff is seeking rescission, "the trial court must balance the equities to determine whether the plaintiff is entitled to the relief he or she seeks." *Johnson v. QFD, Inc*, 292 Mich. App. 359, 370 n. 3, 807 N.W.2d 719 (2011). With respect to the balancing of equities, the Michigan Supreme Court has determined that, "rescission should not be granted in cases where the result thus obtained would be unjust or inequitable" and it should not be granted in cases "where the circumstances of the challenged transaction make rescission infeasible". *Bazzi*, 502 Mich. at 409 (quoting *Amster v. Stratton*, 259 Mich. 683, 686, 244 N.W. 201, 202 (1932)).

### ii.  Analysis

Undisputedly, WPC was administratively dissolved on July 15, 2019, before it renewed its insurance policy with EMC in November 2019. As such, EMC asserts that the Policy may be rescinded because "WPC could not enter into a renewal contract of insurance while [it was] no longer a viable corporation." ECF No. 28,

8

PageID.684. In support of its argument, EMC relies on an assortment of Michigan statutory provisions contained in the Michigan Business Corporation Act (the "Act").

The provision for administrative dissolution provides that, when a corporation "neglects . . . to file an annual report or pay an annual filing fee or a penalty added to the fee required by law, and the neglect . . . continues for a period of 2 years from the date on which the annual report or filing fee was due, the corporation is automatically dissolved 60 days after the expiration of the 2-year period." M.C.L. § 450.1922(1).

§450.1833 specifies that a dissolved corporation "shall not carry on business except for the purpose of winding up its affairs" by:

(a) Collecting its assets.

(b) Selling or otherwise transferring, with or without security, assets which are not to be distributed in kind to its shareholders.

(c) Paying its debts and other liabilities.

(d) Doing all other acts incident to liquidation of its business and affairs.

*Id.* Other sections of the Act also make clear that § 450.1833 circumscribes a limitation on corporate activity during a period of administrative dissolution. See § 450.1834 (stating that "[s]ubject to section 833 [§ 450.1833] and except as otherwise provided by court order, a dissolved corporation, its officers, directors and

shareholders shall continue to function in the same manner as if dissolution had not occurred"). Read together, the Act's provisions establish that an administratively dissolved corporation may continue its existence solely for purposes of winding up its affairs.

EMC suggests that the renewal policy "did nothing to further the liquidation of WPC" and therefore, "the renewal policy was ineffective after July 15, 2019, and on February 5, 2021[,]" the date of the loss. ECF No. 28, PageID.686. "WPC did not obtain the EMC renewal policy as part of a dissolved corporation's winding up activities," EMC argues, "WPC's business manager testified that the corporation became dissolved through her error in not filing annual reports." ECF No. 28, PageID.685. And EMC believes that WPC "continued business as usual for years after dissolution, including purportedly entering into leases with various tenants." *Id*.

In *Pete's Auto*, the Michigan Court of Appeals addressed the question whether a "defunct" corporation "lacked the ability to maintain insurance—either personally or through someone else. . ." *Pete's Auto & Truck Parts, Inc. v. Greg Hibbits Transport Co.*, 2022 WL 2079834, at *8 (Mich. Ct. App. Jun. 9, 2022). The court ruled that, "part of a dissolved corporation's power to hold assets necessarily includes the authority to take steps to preserve its assets while winding up." *Id*. (citing *Kay Furniture Co v Rovin*, 312 Mich. 290, 294; 20 NW2d 194 (1945) (*Kay*

10

*Furniture Co*. held that a corporation's renewal of a lease was not an improper continuation of business affairs but was simply "perpetuat[ing] and thereby conserv[ing] a potential asset"). The Court explained that preserving assets while winding up would include maintaining insurance on assets during the winding up process. *Id*. *Pete's Auto* suggests that a dissolved corporation may maintain an insurance Policy as part of its winding up affairs.

Viewing the facts in the light most favorable to WPC, the inference EMC urges the Court to reach—that renewing the insurance policy did not help further liquidation or winding up of affairs—is impermissible at the summary judgment stage. A reasonable factfinder could hear the testimony of WPC's business manager, understand the fact that WPC was a dissolved corporation when it renewed its insurance contract, and still conclude that—though WPC's dissolution was done in error—its corporate officers engaged activities related to the winding up of WPC's affairs. The Court finds that a genuine issue of material fact exists regarding the question whether WPC maintained the insurance policy as part of its winding up activities.

Additionally, it is undisputed that, in accordance with § 450.1925(1), WPC revived its corporate existence on October 11, 2021, nearly two months after the

instant action commenced.[1] Revival extends a corporation's existence retroactively to cover the years during which it neglected its administrative filing requirements. See § 450.1925(2) (indicating that "upon compliance" with § 450.1925(1), "the rights of the corporation shall be the same as though a dissolution or revocation had not taken place, and all contracts entered into[,] and other rights acquired during the interval shall be valid and enforceable").

EMC avers that "there is no authority to support the extraordinary proposition that a dissolved corporation has a right to insist that it be afforded insurance coverage many months after dissolution, for a loss occurring during the period of dissolution, unrelated to the winding up of corporate affairs, and while continuing to operate in violation of the BCA." ECF No. 28, PageID.685. Such an interpretation of M.C.L. § 450.1833, EMC avers, "would render the limitations imposed therein meaningless." *Id*.

Contrary to EMC's argument, no court has ever held that § 450.1833's limitations on corporate activity during a period of administrative dissolution go so far as to invalidate § 450.1925(2)'s retroactive enforcement of contracts previously

---

[1] § 450.1925(1) provides that a "domestic corporation which has been dissolved under subsection (1) of section 922 . . . may renew its corporate existence or its certificate of authority by filing the reports and paying the fees for the years for which they were not filed and paid, and for every subsequent intervening year, together with the penalties provided by section 921. Upon filing the reports and payment of the fees and penalties, the corporate existence or the certificate of authority is renewed."

entered into—during the period of dissolution—by a now revived corporation.

Neither party cites caselaw that resolves the issue. Instead, EMC relies on *Woodbury*

*v. Res-Care Premier, Inc*., 494 Mich. 879, 880; 833 N.W.2d 330 (2013), where the

Michigan Supreme Court, without deciding the issue, ordered the parties to file

supplemental briefing addressing, in relevant part, the following issues:

> (1) whether § 925(2) of the Nonprofit Corporation Act (NCA), [the provision of the NCA that is analogous to MCL § 450.1925(1)] applies retroactively or prospectively to validate 'all contracts entered into and other rights acquired' during dissolution; (2) whether renewal pursuant to § 925 permits an administratively dissolved corporation to enforce contracts and rights not related to winding-up in light of MCL 450.2833 and MCL 450.2834; (3) whether *Bergy Bros., Inc. v. Zeeland Feeder Pig, Inc*., 415 Mich. 286, 327 N.W.2d 305 (1982), correctly interpreted MCL 450.1925, the analogous provision in the Business Corporation Act, MCL 450.1101 et seq.;

*Id*.  The operative question before the Court was not addressed in *Woodbury*.

Without citing any applicable authority, EMC urges the Court to find that §

450.1925(2) "should be interpreted to mean that insurance contracts entered into by

an administratively dissolved corporation, during the period of dissolution, may only

be enforced by the revived corporation prospectively to the extent that the policy

affords coverage to losses occurring after corporate status has been renewed, not

retroactively to losses occurring during the period of dissolution." ECF No. 28,

PageID.686. Plaintiff says that "the Michigan Supreme Court's order in *Woodbury*

foreshadowed the possibility of this interpretation." *Id*. *Woodbury* did not

foreshadow the interpretation that EMC advances; there, the Michigan Supreme Court simply required the parties to brief the issue.

EMC says its interpretation of § 450.1925(2) is consistent with Michigan precedent because, "at common law, upon dissolution of a corporation, 'there is no one to serve, because, in law, a dissolved corporation is a dead person, so much so that, in the absence of statute and revival, even pending actions by or against it would abate.'" *Id*. at PageID.686. (quoting *Gilliam v. Hi–Temp Prod., Inc*., 260 Mich.App. 98, 112, 677 N.W.2d 856 (2003) (internal quotations omitted). *Gilliam* does not purport to interpret § 450.1925(2), and it says nothing about causes of action brought by or against a revived corporation related to corporate acts that occurred during a period of dissolution.

EMC also submits that the "'all contracts entered into and other rights acquired during the interval shall be valid and enforceable'" language of  § 450.1925(2) "applies to the retroactive liability of a corporation" so as to "prevent[] a situation in which a corporation could enter into contracts during the period of dissolution, become reinstated, and then escape liability [for] the contracts on the basis that[,] because it did not exist at the time the contracts were executed, the contracts were void *ab initio*." ECF No. 28, PageID.687.

Here, EMC's interpretation of the statute is not incompatible with the conclusion that § 450.1925(2)'s retroactive enforcement provision applies to

insurance contracts formed during a period of dissolution by a now revived corporation. Michigan courts recognize that "'the provision suspending the powers of a corporation was intended by the Legislature merely to enforce payment of fees and compel compliance with statutory duties.'" *City Commc'ns, Inc. v. City of Detroit*, 888 F.2d 1081, 1086 (6th Cir. 1989) (quoting *Michigan Rural Dev. v. El Mac Hills Resort,* 34 Mich.App. 505, 509, 191 N.W.2d 733, 735 (1971) (discussing the statutory predecessor to M.C.L § 450.1922, the statute that provides for administrative dissolution)). "'As a result, where a corporation has cured its default, whether due to pressure caused by inability to proceed with a lawsuit or by inability to exercise some other corporate power, the purposes of the statute have been fulfilled and no further sanction is necessary.'" *Id.*

In *Michigan Rural Dev*., the plaintiff, a Michigan corporation, sued to enforce a contract in March 1970. *Michigan Rural Dev*., 191 N.W.2d at 733. In May 1970, the plaintiff corporation was administratively dissolved. *Id*. In July 1970, the defendant moved for summary disposition based on the corporation's dissolution. Faced with the possibility of dismissal, the plaintiff "renewed" its corporate existence. *Id*. The Michigan Court of Appeals affirmed the trial court's denial of the defendant's motion for summary disposition, holding that "a corporation is entitled to proceed with a pending lawsuit if it cures its default at any time prior to actual dismissal of a suit." *Id*. at 735. See also *Shurlow Tile & Carpet v. Dahlmann Bldg.*

15

*Co*., 54 Mich.App. 180, 220 N.W.2d 732, 734 (1974) (holding a corporation dissolved by state law after it began performing a contract could enforce the contract after renewing its corporate existence).

Michigan courts have "established that a corporation dissolved for failure to file annual reports and to pay filing fees does not cease to exist, but remains a body corporate to hold and have possession of its property and to conserve the same until due proceedings are had either to cure the default, which caused the loss of the charter, or to wind up its affairs in an orderly manner." *City Commc'ns, Inc*., 888 F.2d at 1087 (citing Michigan cases) (internal quotations and citations omitted)*.* The statute providing for dissolution "must be read in light of the statute providing for retroactive reinstatement of the charter." *Bergy Bros., Inc. v. Zeeland Feeder Pig, Inc*., 415 Mich. 286, 293–96, 327 N.W.2d 305, 308 (1982). Accordingly, as the Michigan Supreme Court explained in *Bergy Bros*., "[w]here ... the corporate charter has been reinstated pursuant to the statute, the corporation should be considered to have had at least de facto existence during the period of forfeiture...." *Id*. 327 N.W.2d at 309.

Michigan case law supports the conclusion that, because WPC renewed its corporate charter before EMC could succeed in its attempts to rescind the contract, § 450.1925(2) renders the insurance contract valid and enforceable (unless an additional reason for recission exists beyond dissolution of the corporation), even

though WPC entered into the contract while it was administratively dissolved. §
450.1925(2) expressly made renewal of WPC's existence retroactive by providing
that renewal operated to validate all contracts entered into during the period of
dissolution. Where, as here, the corporate existence has been renewed pursuant to
the statute, the corporation should be considered to have had at least de facto
existence during the period of dissolution, which would preclude the application of
equitable recission principles based on the corporation's administrative dissolution.

Since WPC has undisputedly satisfied §450.1925(2)'s renewal provision, the
Court must now view WPC's rights to the insurance policy as they would have been
if WPC had not been dissolved. See § 450.1925(1), ("the rights of the corporation
shall be the same as though a dissolution or revocation had not taken place"). At the
time when the policy renewal and the subsequent loss occurred—absent the
administrative dissolution—the policy would not have been voidable due to §
450.1833's restrictions on its corporate activities. The policy would not have been
voidable then, so it is not voidable now.

Accordingly, the Court will deny EMC's Motion for summary judgment on
this ground. The Court next turns to EMC's argument that the policy is void due to
WPC's concealment, misrepresentation, and fraud.

**(2)** **Whether EMC is entitled to void the policy because of WPC's concealment, misrepresentation, and fraud**.

EMC avers that "recission is available . . . under the concealment and fraud provision of the policy." ECF No. 28, PageID.687. The provision states the following.

**SECTION III – COMMON POLICY CONDITIONS (APPLICABLE TO SECTION I – PROPERTY AND SECTION II – LIABILITY)**

C. Concealment, Misrepresentation Or Fraud

> This policy is void in any case of fraud by you as it relates to this policy at any time. It is also void if you or any other insured, at any time, intentionally conceals or misrepresents a material fact concerning:
>
> 1.  This policy;
>
> 2.  The Covered Property;
>
> 3.  Your interest in the Covered Property; or
>
> 4.  A claim under this policy.

ECF No. 28-2, PageID.762. The Policy provides that the policy is void if the insured engages in fraud or intentionally conceals or misrepresents a material fact.

When insurance contracts contain language similar to the Policy at issue here, "Michigan courts deem the policy void where the insurer can show[:] (1) that the insured made a material representation, (2) that the representation was false, (3) that the insured knew the representation was false or made the representation

18

'recklessly, without any knowledge of its truth,' and (4) that the insured made the representation intending that the insurer would act on it. *Meat Town v. Sentinel Ins. Co., Ltd*., 413 F. Supp. 3d 671, 673 (E.D. Mich. 2019) (citing *Nahshal v. Fremont Ins. Co*., 324 Mich.App. 696, 922 N.W.2d 662, 675 (2018)). "Where an insurance policy provides that an insured's concealment, misrepresentation, fraud, or false swearing voids the policy, the insured must have actually intended to defraud the insurer." *West v. Farm Bureau Mut. Ins. Co. of Michigan*, 402 Mich. 67, 69, 259 N.W.2d 556, 557 (1977).

"A statement is material if it is reasonably relevant to the insurer's investigation of a claim." *Mina v. Gen. Star Indem. Co*., 218 Mich. App. 678, 686; 555 N.W.2d 1 (1996*), rev'd in part on other grounds*, 455 Mich. 866; 568 N.W.2d 80 (1997). Because EMC seeks summary judgment, it must show that the evidence, viewed in the light most favorable to WPC, would cause a reasonable factfinder to find that each of the four elements are satisfied. See *Cockrel v. Shelby Cty. Sch. Dist.*, 270 F.3d 1036, 1056 (6th Cir. 2001).

In its Motion, EMC maintains that "[p]ursuant to the misrepresentation and concealment provision, coverage under the renewal policy is void because WPC misrepresented and concealed material and relevant facts concerning the claim, and its ownership interest in the covered property." ECF No. 28, PageID.689.

Specifically, EMC asserts that, had it "known that WPC had been dissolved as of July 15, 2019, it would have taken steps to cancel or rescind the 11/21/18 to 11/21/19 policy as of that date and it would have refused to issue the renewal policies covering terms 11/21/19 to 11/21/20 and 11/21/20 to 11/21/21." ECF No. 28, PageID.690; see ECF No. 28-12, PageID.1278-1279 (Affidavit of Ryan Adams, Branch Underwriting Director at EMC).

As business manager for WPC, Ms. Wahl was responsible for the company's corporate filings. ECF No. 28-8, PageID.1171. Her deposition testimony indicates that she was "aware that there were no corporate filings for [WPC] from October 24th of 2016 to October 11th of 2021." *Id*. She also stated that the failure to file for five years "was just an error" and that she became "aware in October 2021 that the error needed to be corrected" because WPC "received notices from the State." *Id*. She received those notices "every year" but "did not respond" because, in her words, "I guess when they came in I would like set them aside and think to get back to them, but I had not." *Id*.

The undisputed facts demonstrate that Ms. Wahl became aware, in October 2021, that the error which led to the corporation being dissolved needed to be corrected. However, the record does not answer the disputed question of fact: did Ms. Wahl become aware of WPC's dissolution before October 2021? Further, EMC makes no offer of proof to show that WPC intentionally concealed the fact that it

20

had been administratively dissolved. And EMC does not cite evidence to show that WPC represented to EMC that it had an active corporate existence and knew that representation was false when made. Likewise, EMC cites no evidence to show that WPC made the representation without any knowledge of its truth. Indeed, undisputed facts do not purport to show that WPC intended to deceive EMC or that it recklessly disregarded the truth with respect to its administrative dissolution.

At the summary judgment stage, the burden of establishing the nonexistence of a "genuine issue" is on the party moving for summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330, 106 S. Ct. 2548, 2556, 91 L. Ed. 2d 265 (1986). To defeat EMC's motion, WPC may rely on a showing "that a party who does have the trial burden [did not] produce admissible evidence to carry its burden as to the fact." See Fed. R. Civ. P. 56, Advisory Committee Notes to Subdivision (c)(1)(B), 2010 Amendment (emphasis added). As EMC notes, "to void coverage, an insurer need only establish misrepresentation or concealment by a preponderance of evidence." ECF No. 28, PageID.688 (citing *Stein v. Home-Owners Ins. Co*., 303 Mich. App. 382, 388-391; 843 N.W.2d 780 (2013)). EMC is the insurer and thus has the trial burden of showing that the Policy is void. With respect to its assertion that WPC intentionally misrepresented or concealed the administrative dissolution, EMC fails to demonstrate the absence of any genuine issue of material fact.

EMC also avers that it would have canceled the insurance policy and not renewed it "if EMC had known that WPC had sold the property." ECF No. 28, PageID.690. A December 5, 2019, land contract indicates that "Woodward-Parker Corp Inc." sold the insured property to "Trillion, LLC" for $4.2 million. ECF No. 28-6, PageID.914. And in January 2023, Trillion executed a quitclaim deed for the insured property to WPC, after Mr. Parker had already passed away. ECF No. 28-8, PageID.1172. Mr. Parker testified that the transaction "ceased", "resolved", or "fell apart" because "the buyer could not raise the money and could not perform inspections" due to the pandemic. ECF No. 28-7, PageID.978. Mr. Parker did not indicate the date on which the sale fell apart. *Id*.

Ms. Wahl also testified about the purported sale of the building. She was aware that Mr. Parker and Trillion "were in negotiations" and that a land contract was recorded with the Oakland County Register of Deeds, but she was "not aware of any sale." ECF No. 28-8, PageID.1172. Critically, she testified that, "I think [Trillion] did it [(filed the land contract)] without Mr. Parker's permission and that's why the quit claim deed then was done because as far as I know, there was never any exchange of monies between Mr. Parker and Trillion for the sale of the building." *Id*. at PageID.1207. According to Wahl, Parker asked her in early 2020 to prepare the quitclaim deed, but that it took her until early 2023 to get it executed and recorded because of the COVID-19 pandemic. *Id*. at PageID.1207-08.

22

Viewing the facts in the light most favorable to WPC, a reasonable factfinder could conclude that WPC did not sell the building or that it did not intentionally conceal or misrepresent the transferal of ownership over the building. There is a genuine issue of material fact regarding whether WPC transferred ownership of the property to Trillion and whether WPC intentionally concealed or misrepresented the alleged transferal of ownership. On this basis, EMC's Motion is denied.

For EMC's final push to void the Policy, it argues that "the evidence also supports the conclusion that WPC intentionally presented EMC with false and fraudulent lease agreements in an effort to mislead EMC concerning the occupancy status of the insured property in the 60 days prior to the date of loss." ECF No. 28, PageID.690.

First, EMC asserts that "Parker admits that he was not in Michigan during 2019 when five of the six leases were purportedly signed by him" and "although there are purported signatures on each lease by lessees and witnesses, none of the signatures are notarized and most are illegible." *Id.* at PageID.690. However, Ms. Wahl testified that she "did witness him signing the documents via Skype[,]" though he did not personally appear in front her to sign the leases. ECF No. 28-8, PageID.1178.[2] Lastly, the evidence does not demonstrate that WPC told EMC that

---

[2] Ms. Wahl was asked during her deposition if there was "any prism into the statue[,] to the best of your knowledge[,] that allows witnessing of signatures via Skype pre-COVID." ECF No. 28-8, PageID.1182. She answered, "No." *Id.* Yet, record does

the lessee signatures were notarized or that the leases were not in fact signed by the respective individuals whom WPC purports to have signed them.

EMC also alleges that "[t]he lease with Platinum Group was supposedly signed on December 6, 2019, the day after the insured property was sold." ECF No. 28, PageID.690. Further, "three other leases bear execution dates in December 2019, all after the December 5, 2019 date of the land contract sale of the WPC property to Trillion, LLC." *Id*. Viewing the facts in the light most favorable to WPC, these allegations do not demonstrate that WPC intentionally misrepresented the fact that tenants occupied the building in the 60 days prior to the loss. And the fact that WPC executed several lease agreements during a failed sale of the building does not give rise to the inference that the leases are fraudulent.

EMC says that "[b]y far the most telling evidence of fraud and misrepresentation by WPC", "is a December 1, 2012 lease between WPC and Competitive Education Solutions, Inc." *Id*. at PageID.691. Wahl notarized Parker's signature on the lease as having been executed on December 1, 2012. *Id*. The notary stamp Ms. Wahl used to notarize this signature, however, indicates that her commission expires on May 16, 2024. Under M.C.L. § 55.269(2), the six-year notary commission would not have issued until May 16, 2018, after the December

---

not demonstrate that WPC intentionally misrepresented or concealed the fact that Ms. Wahl witnessed Mr. Parker sign the leases via Skype, rather than in person.

1, 2012 date. Thus, "it was impossible[,]" EMC avers,  "for Wahl to have notarized the document in 2012 under the authority of a notary commission not yet issued." *Id*.

During her deposition, Ms. Wahl was asked, "how it was that [she] was able to notarize a document with a notary commission that [she] didn't even have at the time that [she] notarized it." ECF No. 28-8, PageID.1194. She answered, stating, "that's not correct . . . [b]ecause I was trying to update the lease and I guess I missed the changing of the dates on the lease agreement[,]" though she did not recall when she updated the lease. *Id*. Ms. Wahl's testimony suggests that the error pertaining to the dates of her notary commission was the result of an error. Further, Dr. Mildred Mason, sole owner of Competitive Education Solutions (CES), declared in an affidavit that CES "renewed its office space lease" with WPC in the building on December 1, 2019. She stated that the "CES lease . . . was executed by me and intended to be for the term of December 1, 2019, through November 30, 2022" and that "the lease contains several typographical and handwritten errors wherein the year 2012 was written in error instead of 2019." ECF No. 32, PageID.1440.

At the summary judgment stage, the district court's function is "not to weigh the evidence and determine the truth of the matter," but "to determine whether there is a genuine issue for trial; in undertaking this inquiry, credibility judgments and weighing of the evidence are prohibited." *Moran v. Al Basit LLC*, 788 F.3d 201,

205 (6th Cir. 2015). Viewing the facts in the light most favorable to WPC, a reasonable factfinder could conclude that the leases were not fraudulent. There is a genuine issue of material fact regarding whether WPC had leases with: (1) Parker McGruder and Associates, P.C.; (2) Competitive Education Solutions; (3) Huoban, LLC[3]; (4) F&D Business Consulting, LLC; (5) Trinity House of Prayer; and (6) Platinum Group. These factual disputes preclude summary judgment.

Next, the Court turns to the property loss conditions of the Policy.

### (3) Whether WPC violated the Property Loss Conditions Provisions of the Policy.

The policy provides the following.

3. Duties In The Event Of Loss Or Damage

a.  You must see that the following are done in the event of loss or damage to Covered Property: . . .

(4) Take all reasonable steps to protect the Covered Property from further damage, ….

(5) At our request, give us complete inventories of the damaged and undamaged property. Include quantities, costs, values and amount of loss claimed.

(6) As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records. Also permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies from your books and records. . .

---

[3] Dr. Mason's affidavit also declares that she is the sole owner of Huoban and that it entered a lease agreement with WPC for office space in the building as well.

(8) Cooperate with us in the investigation or settlement of the claim

ECF No. 28-2, PageID.735.

EMC avers that summary judgment is warranted because WPC violated the property loss conditions by refusing to provide information concerning WPC's accountant and its financial records, whether it paid taxes, whether WPC had a bank account it used for operational purposes, and whether tenants paid security deposits, utility bills, and made rent payments. ECF No. 28, PageID.393. "This information was obviously significant to EMC's investigation of the claim," EMC says, "and, in particular, as to whether the leases are authentic and if the insured property was occupied or vacant." *Id*. EMC quotes the *Vertex* case, which states that "[c]ontract terms that require the insured to provide documentary information or submit to examinations under oath are enforceable as a matter of contract law." *Vertex Intern. Mgmt. Servs., L.L.C. v. State Farm Fire & Cas. Co*., 120 F. Supp. 3d 658, 662 (E.D. Mich. 2011) (citing *Thomson v. State Farm Ins. Co.,* 232 Mich. App. 38, 44–45, 592 N.W.2d 82 (1998)).

In the *Vertex* case, the court dismissed an insured's claim. The insurer's policy contained a provision that stated, "no action shall be brought unless there has been compliance with the policy provisions and the action is started within one year after the date of loss or damage." *Vertex*, 120 F. Supp. at 662. The plaintiff insured

brought an action based on the defendant insurer's failure to pay insurance benefits after the property was destroyed by a fire. *Id*. at 660. Defendant filed a motion for summary judgment, which the court granted. It held that the insured was not in substantial compliance with the policy's pre-suit condition precedent, which required the insured to satisfy the insurer's reasonable request for information and document production. *Id*. at 665. The court reasoned that, despite producing other requested documents and submitting to examination under oath, the insured and its principal did not comply with requests for relevant and admissible tax returns and financial information that were probative of whether the fire was caused by arson. *Id*. at 663-664 (stating that "evidence of fluctuation in one's financial circumstances is relevant and admissible to demonstrate motive to commit arson on an insured property."). "Even viewing the evidence in the light most favorable to Vertex," the court stated, "a jury could not find that Vertex substantially complied with the policy's requirement that it provide the documents and records material to State Farm's request." *Id*. at 665

Unlike the *Vertex* case, here, EMC fails to demonstrate that WPC did not substantially comply with its duty to cooperate with EMC's investigation. In response to EMC's suspicions about the authenticity of the leases, Mr. Parker sat for two examinations under oath and provided EMC with leases that purportedly corresponded to the tenants who occupied the building in the 60 consecutive days

28

before the loss. EMC noted in its reply, that the "most obvious way to [demonstrate the authenticity of the leases or the fact of tenant occupancy] would have been by the submission of affidavits or deposition testimony from the ostensible lessees." ECF No. 31, PageID.1437. At the time that EMC filed the instant motion, WPC had not submitted any affidavits.

Since then, however, Dr. Mildred Mason submitted an affidavit on behalf of CES and Huoban. In her affidavit, she maintains that "CES continually leased Suite 106 and maintained office furnishing and business property in its leasehold space in the building from approximately 2013 through November 30, 2022." ECF No. 32, PageID.1440. She also declares that Huoban leased Suite 100 and maintained office furnishing and business property in its leasehold space in the building from approximately July 3, 2019, through the date of the water loss on February 5, 2021. *Id*. Lastly, Mr. Parker and Dr. Mildred both attested to the alleged fact that Parker, McGruder and Associates, P.C. maintained its office in the insured property.

On this basis, a reasonable factfinder could conclude that WPC substantially complied with its duty to cooperate with EMC's investigation, which was aimed at determining the authenticity of the leases and whether the property was vacant in the 60 consecutive days before the loss. See *Vertex*, 120 F. Supp. at 665 ("Under Michigan law, a deviation from the absolute terms of a contract is not sufficient to

constitute a failure of performance.") (Citing *Gibson v. Group Ins. Co.*, 142 Mich.App. 271, 275–76, 369 N.W.2d 484 (1985)).

Finally, EMC avers that summary judgment is warranted because, "[o]ther than turning on pumps in the building and putting the heat on high, WPC made no other effort to extract water from the premises and, thus, failed to take reasonable steps to protect the property from further damage." ECF No. 28, PageID.692. However, WPC alleges that it hired a contractor to remove the wet drywall, carpet, and ceiling tiles. ECF No. 29, PageID.1306.[4] A reasonable factfinder could conclude that WPC acted reasonably to protect the property from further damage.

The Court finds that genuine issues of material fact exist regarding whether WPC substantially performed its duties under the Policy to mitigate loss and cooperate with EMC's investigation. Next, the Court turns to the vacancy conditions provision of the policy.

---

[4] On this basis, the Court also finds that genuine issues of material fact exist regarding whether coverage is precluded under the Policy's "neglect" exclusion. The exclusion states that EMC will not pay for loss or damage caused directly or indirectly by "[n]eglect of an insured to use all reasonable means to save and preserve property from further damage at and after the time of loss." ECF No. 28-2, PageID.732. A reasonable factfinder could conclude that WPC used all reasonable means to save and preserve the property from further damage at the time of the loss. At minimum, however, a genuine issue of material fact exists pertaining to the application of the neglect exclusion.

**(4) Whether WPC Violated the Vacancy Conditions Provision of the Policy**.

The policy contains the following vacancy condition applicable to an owner:

**a. Description Of Terms**

(1) As used in this Vacancy Condition, the term building and vacant have the meanings set forth in Paragraphs (a) and (b) below:

(a) [ * * *]

(b) When this policy is issued to the owner or general lessee of a building, building means the entire building. Such building is vacant unless at least 31% of its total square footage is:

    (i)    Rented to a lessee or sublessee and used by the lessee or sublessee to conduct is customary operations and/or

    (ii)    Used by the building owner to conduct customary operations.

(2) Buildings under construction or renovation are not considered vacant.

**b. Vacancy Provisions**

If the building where loss or damage occurs has been vacant for more than 60 consecutive days before that loss or damage occurs:

(1) We will not pay for any loss or damage caused by any of the following even if they are Covered Causes of Loss:

    (a) Vandalism;

    (b) Sprinkler leakage, unless you have protected the system

    against freezing;

    (c) Building glass breakage;

(d)Water damage;

(e) Theft; or

(f) Attempted theft.

ECF No. 28-2, PageID.739.

The Policy provides that, where a building has been vacant for 60 consecutive days before any loss or damage occurs, EMC will not pay for any loss or damage caused by water damage, or sprinkler leakage, unless the owner has protected the sprinkler system against freezing. The ROR EMC sent to WPC stated that, "[t]here were no tenants present during the inspections conducted by the adjusters EMC dispatched to the premises after the loss occurred." ECF No. 28-11, PageID.1266. Furthermore, EMC alleges that during its investigation of WPC's claim, "it became evident that the leases are not authentic . . ." ECF No. 28, PageID.695.

In April 2021, EMC forwarded the above referenced leases to EMC. WPC claimed that three tenants occupied 50% of the above-ground space, and another the basement. The three leases that allegedly occupied 50% of the insured property corresponded to the following tenants: (1) Mr. Parker's law firm, Parker McGruder and Associates, P.C.; (2) CES; and (3) Huoban, LLC. Dr. Mildred Mason's affidavit declares that both CES and Huoban occupied the building as tenants in the 60 consecutive days before the loss. Further, Mr. Parker and Dr. Mildred both attested

to the alleged fact that Parker, McGrduder and Associates, P.C. maintained its office

in the insured property.

Viewing the facts in the light most favorable to WPC, the Court finds that

genuine issues of material fact exist regarding whether the leases were fraudulent

and whether the building was vacant in the 60 consecutive days before the loss

occurred. A reasonable factfinder could conclude that WPC did not violate the

vacancy conditions of the Policy.

### (5) Whether Coverage is Precluded By Policy Exclusions

Finally, EMC also avers that coverage is precluded by the following "Fungi"

Wet Rot Or Dry Rot exclusion:

**B. Exclusions**

1.  We will not pay for loss or damage caused directly or indirectly by any
    of the following. Such loss or damage is excluded regardless of any
    other cause or event that contributes concurrently or in any sequence to
    the loss. These exclusions apply whether or not the loss event results in
    widespread damage or affects a substantial area.

    > i.  "Fungi", Wet Rot or Dry Rot Presence, growth,
    >     proliferation, spread or any activity of "fungi", wet rot or
    >     dry rot. But if "fungi", wet rot or dry rot results in a
    >     "specified cause of loss", we will pay for the loss or
    >     damage caused by that "specified cause of loss".

    This exclusion does not apply:

(1) When "fungi", wet rot or dry rot results from fire or lightning; or
(2) To the extent that coverage is provided in the Limited Coverage For
    "Fungi", Wet Rot Or Dry Rot Additional Coverage, with respect to loss
    or damage by a cause of loss other than fire or lightning.

ECF No. 28-2, PageID.727, 730. The policy defines "fungi" as "any type or form of fungus, including mold or mildew, and any mycotoxins, spores, scents or byproducts produced or released by fungi." *Id*. at PageID.743.

EMC avers that, because the April 2021 inspections of the premises demonstrated the presence of mold, the exclusion applies. Given that the mold was not discovered until two months after the initial loss, the parties' briefing does not address the genuine issue of material fact that arises from application of the Fungi exclusion: what percentage of the overall loss was caused by mold?

There is a genuine issue of material fact regarding whether the policy exclusions bar any and all recovery for the February 5, 2021 loss. On this basis EMC's motion for summary judgment is denied.

## V.    Conclusion

EMC's Motion for summary judgment is **DENIED**.

**SO ORDERED.**

Dated:  February 28, 2024                    /s/Gershwin A. Drain
                                             GERSHWIN A. DRAIN
                                             United States District Judge


CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
February 28, 2024, by electronic and/or ordinary mail.
/s/ Lisa Bartlett
Case Manager